Samuel S. Lbibowitz, J.
In this death action, plaintiff’s complaint is based upon two separate causes of action — a survival cause for conscious pain and suffering, and the other for wrongful death. The action has been discontinued as against the City of New York leaving only the New York City Housing Authority as defendant. I find and decide that plaintiff, as administrator, is entitled to judgment against defendant, New York City Housing Authority, in the sum of $100,000 on the survival cause of action, and.in the amount of $35,000 on the cause for wrongful death.
The parties to this action have waived a trial by jury and have submitted the matter for decision by the court upon an agreed statement of facts which has been dictated into the record. Counsel for both sides were additionally invited to submit any other facts pertinent to the issues by witness or other acceptable evidence.
The plaintiff is the administrator of the estate and was the father of Lourdes Regina Bass, a nine-year-old girl, now deceased, who lived with her parents in Farragut Houses, a housing project owned and operated by defendant, New York City Housing Authority. This project consisted of 10 buildings of 14 stories each in a 16-acre complex of roads, walks and other ancillary facilities.
On December 4, 1962, at approximately 12:30 p.m., Lourdes, a student at St. James Parochial School, having finished her lunch, was on her way back to school. She was seized near the rear entrance hall of the building by one James Rooks, a resident of another building in the same project. Rooks took the child to the roof of the building, stripped her of her clothing, and raped her. He then held her over the roof edge, suspended 14 stories above the street until she promised not to disclose the incident. When he replaced her on the roof, she broke away and Rooks pursued her. After a scuffle, he again seized her and again held her over the roof parapet. He shook her repeatedly and finally dropped her at approximately 12:55 p.m. She fell .14 stories to the pavement of the courtyard and died of resultant injuries.
Defendant Housing Authority, reputed to be the largest landlord in the world, and certainly in this country, is authorized *467 by section 402 of the Public Housing Law, at its discretion, to provide and maintain a uniformed police force. Bach member of such police force, pursuant to the terms of this .section, is vested with all authority incidental to that of a peace officer and when on duty has ‘ ‘ all the powers of a policeman of a city in the execution of criminal process.” (Subd. 5.) The Housing Authority elected to assume the powers so permitted by law and organized a uniformed police force operating on its behalf in its various projects for the purposes directed by section 402 which, insofar as pertinent here, states: ‘ ‘ Such department and force shall have the power and it shall be their duty, in and about housing facilities, to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct free passage; protect the rights of persons and property; guard the public health; remove all nuisances; enforce and prevent violation of all laws and ordinances; and for these purposes to arrest all persons guilty of violating any law or ordinance.”
It is conceded by defendant that on the day of the incident here, December 4, 1962, one housing police officer, Charles Howard, was assigned to this 10-building, 16-acre project. It is agreed also that he knew and was aware that there were elementary and junior high schools nearby and that children in the project came home for lunch between 12 and 1 each day. At the precise time when little Lourdes was seized, raped and then thrown to her death, this officer was at lunch. On the roofs of three of the buildings in the project were telephone call boxes connected with police headquarters. These telephones when in use activated whirling lights above. There was no such installation or arrangement or light on the building in which Lourdes lived. Officer Howard received his first notification of the crime through a call from his headquarters.
Counsel for both sides have agreed that prior to December 4, 1962, this one project had a history of crime ranging from malicious mischief to assault, rape and homicide, some of these incidents involving both adults and children. It has been stipulated by them that official .records of complaints for three years prior to and including the year of the incident, include the following:
In 1960, malicious mischief, 133; assault, 61; burglary, 11; burglary tools, 1; robbery, 5; unlawful entry, 3; dangerous weapons, 2; larceny, 11; criminally receiving, 1; disorderly conduct, 30; vagrancy, 4; vice, 1; narcotics, 1; rape, 2.
*468 In 1961, arson, 1; assault, 59; burglary, 7; robbery, 5; homicide, 3; dangerous weapons, 3; larceny, 15; mail destruction, 12; malicious mischief, 48; disorderly conduct, 48; vagrancy, 3; rape, 1; sodomy, 1.
In 1962, rape, 2; robbery, 6; larceny, 8; burglaries, 5; homicide, 1; mischief, 31; assaults, 18; disorderly conduct, 58; narcotics, 3.
It is conceded also that on the very same day, one-half hour before Lourdes was attacked and murdered, a seven-year-old girl residing in the same building, was accosted in one of the elevators and taken to the basement. When her attacker attempted to remove her clothing, she broke away and escaped.
The issue here is obvious. What obligation did the defendant, Housing Authority, owe to its tenants to protect their lives, safety and property in the circumstances here shown? Concededly, the Housing Authority is a landlord charged at a minimum with the same responsibility of any other landlord in this city. In aid of that duty, the Authority was given powers beyond that of other landlords — the right, if it so chose, to organize and maintain its own uniformed police force, to preserve the peace and protect the .rights and lives of persons on the premises. It is a matter of record and common knowledge that the Authority did in fact elect to assume this power. Such a police force was organized and in existence at the time of the incident here. One of its members was assigned to duty in the project on that day.
Did the Authority by formation of its police force and assignment of its one officer to this project fulfill its legal obligation? Did it discharge all its duties reasonably required of it as a landlord in the circumstances ? Having assumed authority permitted by statute to form such a police force, the assignment of just one of its members to this huge crime-ridden complex must be viewed as a bitter joke on its residents. I cannot see it as even a token response to the obligations thus assumed. The "tenants of the project were without question lulled into a false ■sense of security by the occasional glimpse of a Housing Authority police uniform. These helpless, underprivileged people were entitled to know that they could not rely on their landlord for any form of protection. Armed with this stark reality, they had a choice. They could have made certain that little Lourdes was accompanied by a member of the family or a neighbor when she left the apartment. Perhaps they would have elected to stay in whatever ghetto from which they had originally come and which might have offered a degree of safety without the accoutrements of a modern housing project.
*469 I am informed by counsel for defendant that provision of an adequate police force in its various projects would have been an excessively heavy economic burden. My response to that argument is that it is high time that they assumed that burden. What system of mathematics can we use to balance financial limitations with the tortures suffered by this young soul during her half-hour ordeal ? How can we equate a dollars and cents philosophy with the physical agonies suffered by her until a merciful death extinguished all pain in this defiled and broken body? Notice there was here in overwhelming measure. The number of recorded crimes in this one project brought to this court’s attention reveal it as a lawless jungle, a paradise for criminals. Most startling of all, it is an acknowledged fact that one-half hour before the incident involving the Bass girl, another child, seven years of age, residing in the same building, just barely avoided a similar fate. Defendant takes no issue with these statistics, does not deny that it was the recipient of notice of these conditions in embarrassing abundance. It takes refuge in what it considers settled law — that exposure of defenseless and innocent occupants in these projects to these hazards is a necessary concomitant to life in a housing project and that their potection is beyond its province and no part of its obligations. There was no question here whether there would be a robbery or a rape or an assault, or any other crime against person or property on an almost daily basis. The only question was who would be the next target.
This court is well aware that defendant is not an insurer of the personal safety or property of its tenants. But that simple proposition leaves open a host of situations which call for some reasonable measure of care and protection. I have no difficulty with the ‘ ‘ reasonable ’ ’ care mandated by tort law, which the situation here called for. At the time of the occurrence, there was none. The only man assigned for duty to provide protection to life and property was out to lunch.
Defendant cites 4 cases in support of its position. In Riss v. City of New York (22 N Y 2d 579), a woman injured through the connivance of a former suitor, argued that the city was derelict in its duty to provide her with special police protection in view of the known proclivities and threats of her assailant. The opinion of the Court of Appeals in affirming the dismissal of her complaint draws a clear line between government activities and obligations in what were once “ traditionally private enterprises ” (such as the operation of rapid transit systems, hospitals and places of public assembly) and those toward the *470 public at large, unrelated to such special sectors. The residents in defendant’s project are not members of the public who are casually present in an area for which defendant bears no special responsibility. This is beyond question a “ private enterprise ” with an indicated special responsibility.
New York City Housing Auth. v. Jackson (58 Misc 2d 847 [Civ. Ct., Bronx County, another case cited by the defendant]) involved a summary proceeding for nonpayment of rent brought by the Authority against 53 tenants who urged as a defense the alleged failure of the petitioner to supply adequate protection against criminal activity in their project. The court in that case found insufficient support for the technical defense of an alleged constructive eviction. It is on that ground alone, readily distinguishable from the tort here. However, I can and do take issue with any conclusion that the Jackson case is authority for a rule that the Housing Authority has no obligation in any circumstances to provide police protection. The court in Jackson (p. 850) found no proof that isolated acts, widely separated in time “ could reasonably have been anticipated so as to impose a duty upon the landlord to increase existing security measures.” The facts here beyond question point the other way.
Schuster v. City of New York (5 N Y 2d 75) is. one of the exceptions' which the Riss decision describes. In Schuster the police were charged with a special responsibility to protect the deceased who had aided them in apprehending a dangerous criminal.- They had undertaken to guard Schuster and abandoned his protection shortly before he was slain. The Court of Appeals held that a good cause of action was stated. That holding is not at odds with the plaintiff’s position in this case. The Housing Authority knew that crime was rampant within the confines of its project. It had assumed the burden of protection by establishing a police force. It did not fulfill its obligation by the assignment of one man to provide such protection.
Defendant also quotes at length from a decision by Mr. Justice Fraiman in Murphy v. City of New York (N. Y. L. J., March 12, 1969, p. 17, col. 4), a case involving a woman who was injured by a bomb exploded outside her home by teenagers and who claimed repeated notice to the police. This matter is entirely consistent with the holdings in Riss and Schuster and does not militate against the case before me. No special circumstances were shown to depart from the traditional sovereign liability for protection of the public at large.
I have indulged defendant’s views as represented in the cases cited by its counsel because they rely on them and feel that they *471 are dispositive of the issues here. But as I have pointed out above, defendant’s obligations to the plaintiff’s deceased and to he.r neighbors similarly situated, rest on more specific grounds. I firmly believe that a landlord of a privately sponsored and maintained housing complex such as this, with a similar history of crime and disorder, should bear a special responsibility to protect its residents from these lawless elements. How much greater then is that duty on the part of this defendant who was given the power, and which did in fact choose, to organize its own protective force who are vested with all authority of a regular police force? Having made this choice, it became its further obligation to provide this protection in adequate measure to reasonably secure its tenants against molestation in its own property. The reported cases which confirm the right of a member of the public to protection in subway facilities (Amoruso v. New York City Tr. Auth., 12 A D 2d 11), a library (Abbott v. New York Public Lib., 263 App. Div. 314), a fireworks exhibition in a public park (Caldwell v. Village of Island Park, 304 N. Y. 268), show too that when a government or quasi-government body undertakes a private or special function, it should be held also to a measure of care consonant with such undertaking.
There are no cases in this jurisdiction which are squarely in point and which could be useful as precedents here. My attention has been directed, however, to the case of Goldberg v. Housing Auth. of Newark (38 N. J. 578) which involved a criminal attack on a milk delivery man who was beaten and robbed in a self-service elevator in a housing project. The trial court and an intermediate appellate court both held for plaintiff ‘‘ upon the single thesis that defendant had a duty to provide police protection.” The New Jersey Supreme Court reversed by a divided court of 4 to 3. Examination of the reported opinion discloses that one of the prime reasons for reversal by the New Jersey Supreme Court was that the defendant had no power to maintain or employ its own police force. The court comments, “ Thus, defendant was here held liable for furnishing a type of protection it cannot provide on its own decision. ’ ’ Hence, given the powers accorded and invoked by the defendant Authority in this case, the minority opinion in Goldberg could well be the majority opinion. In fact, the minority opinion in Goldberg is a most persuasive argument for the plaintiff’s position in the case before me.
To point up the factual situation which obtained in this and other housing projects, it is interesting to refer to chapter 878 of the Laws of New York for 1963, which added section 1.01 to the Public Housing Law and which provided as follows: *472 “ Notwithstanding any local or special law or charter provision, a municipality shall, irrespective of the boundaries of a project, provide for the tenants of such project, police, fire and health protection services of the same character and to the same extent as those provided for other residents of the municipality. ’ ’
The memorandum by Governor Rockefeller which accompanied his approval and signature of the bill states: “ This bill, which I recommend during the Legislative Session, clarifies the responsibility of every muncipality to provide the same municipal police, fire and health protection services for the tenants of public housing projects as are provided for other residents of the municipality. * * *
“Residents of public housing projects are entitled to the same safety protections as other residents of a municipality. No municipality should be allowed to deny some of its residents the customary police and other protection merely because they live in public housing.” (N. Y. Legis. Annual, 1963, p. 471.)
It has been fully conceded here that this area was ridden with corruption and crime, that the residents lived under constant threat to their person and property. Yet the Authority was content to leave their ‘1 protection ” to a skeletonized semblance of a police force who were never there when needed, smug and secure in its belief that no court would find as an objective fact that it was indeed derelict in its obligations to its tenants. Given this acknowleged and fully documented history of crime in the project, it was obvious that no adequate measure of protection could be assured with the woefully inadequate housing police. At a minimum, it was incumbent on the Authority to call upon the New York City Police Department to furnish the protection that the Authority could not guarantee. There is testimony in the record by the president of the Housing Authority Police Association that no New York City police officer ever patrolled the interior of the Authority’s property. An officer of the New York City Police Department assigned to roll call duty in the precinct covering this project testified further that patrol duties in the area never included the inside of the project, that no police officer would be assigned for such purpose unless requested. There is no evidence that any such request was ever made. I can only conclude from the record that there was a tacit understanding between the Authority and the New York City police that the city police were to keep out. Apparently the Authority did not see fit to enlist from the city police the protection it could not or would not itself provide. I find it remarkable in the situation that the record *473 of crime in this lawless jungle was not worse than that shown here.
Implicit in any conclusion of culpable negligence must be a concurrent finding of proximate cause to the injuries suffered. No one can state categorically that if the Authority had provided adequate police protection and other reasonable precautions, the Bass child would be alive today. However, I am certain that they would have served as substantial deterrents. Defendant created and maintained a climate in which vice and crime flourished. In this 16-acre community of several thousand inhabitants, lawlessness .reigned unhampered by any police or other restraints. I must take it for granted that the same conditions which dictated a need for telephones with whirling signal lights on the roofs of three of the buildings would also suffice for the remaining seven buildings. When the Bass girl broke loose from Books and ran around the roof of her building, there was a gambling chance that her attacker would have been frightened away had she reached and activated such a phone and signal light. But, there was not any on that roof and therefore we will never know.
To establish proximate cause, it is generally sufficient to .show that the negligent conduct was a substantial factor in causing the injuries. The fact that they might nevertheless have occurred without such negligence is not enough (Rugg v. State of New York, 284 App. Div. 179; Restatement Torts, § 432; 41 N. Y. Jur., Negligence, § 31; 38 Am. Jur., Negligence, § 49 et seq.; 1 Warren’s Negligence, p. 137). Nor is it necessary that “the exact occurrence or the precise injury resulting from this act need be foreseen, all that is necessary is that the person charged with negligence should have been able to foresee that some injury to some person might result from his act ’ ’ (Hoggard v. Otis Elevator Co., 52 Misc 2d 704, 707, affd. 28 A D 2d 1207; see, also, 1 Warren, Negligence, p. 138).
The court held in Amoruso v. New York City Tr. Auth. (12 A D 2d 11, supra) that sufficient causal relationship was established from a showing of inadequate policing of a subway station with a history of assaults, to justify submission to a jury of plaintiff’s claim of injuries from such an assault. Similarly in Abbott v. New York Public Lib. (263 App. Div. 314, supra), the appellate court held that plaintiff’s injuries from an assault under circumstances which indicated a possible need for special precaution by defendant, posed a question of fact sufficient for trial.
There remains for consideration whether the criminal act of Books was an intervening act which was a reasonably fore *474 seeable consequence of defendant’s negligence or whether it was a superseding and in effect independent cause of the injuries. My discussion aboye of defendant’s obligations in the circumstances, in large measure disposes of this question as well. It is impossible to view the criminal attack by Books as unrelated to the total failure of supervision, police protection and other reasonable precautions by defendant. The decisions of the courts in Amoruso, Abbott and Schuster (5 N Y 2d 75, supra), discussed above, establish that a public agency or authority may be liable in similar circumstances though actual injury be inflicted by the hand of another. “ To relieve the first negligent actor of liability for the injury, it must appear that the intervening cause so entirely supersedes his negligence that it alone, without his negligence contributing thereto in any degree, produces the injury.” (41 N. Y. Jur., Negligence, § 36; see, also, 38 Am. Jur., Negligence, §§ 67, 71; 1 Warren, Negligence, p. 120). ‘1 Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant’s negligence.” (Prosser, Law of Torts [3d ed.], p. 312; see, also, Di Sabato v. Soffes, 9 A D 2d 297, 304; Matter of Guardian Cas. Co. v. Wright, 253 App. Div. 360; 362, affd. 278 N. Y. 674.)
Plaintiff’s complaint is based on two separate causes of action — a survival claim and one for wrongful death. The record shows that Lourdes was a healthy child and a good student. At age nine, her life expectancy was approximately 67 years. On the survival cause, this court must take into consideration as an item of damage, conscious pain and suffering by the deceased. The record before me shows that between the time she was seized at the rear entrance of the building and the time she was thrown to her death, a period of approximately 25 minutes elapsed. The mental and physical tortures suffered by this child during that time are not encompassed in a normal lifetime. It would take the imagination and pen of a Dante to do justice to the agonies which she endured in that time. The sum of $100,000 which I have awarded plaintiff as judgment on this cause is fully justified by the circumstances.
On the cause of action for wrongful death, pursuant to EPTL 5-4.1, the representative of the deceased is entitled to “ pecuniary ” damages fo.r the next of kin of the deceased. There are surviving the mother and father of the deceased. There is no provision in the law for compensation for the shame and bitter memories which will stay with these people as long as they live. I have therefore awarded judgment on this cause in the sum of $35,000,